UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

**FILED**

98 DEC 21 PM 12: 41

U.S. DISTRICT COURT
N.D. OF ALABAMA

KATHRYN ANDERSON, et al.,                )
                                         )
    Plaintiff(s),                        )
                                         )
vs.                                      )   CV 97-N-2662-NE
                                         )
CHRYSLER CORP., et al.,                  )
                                         )
    Defendant(s).                        )

**ENTERED**

DEC 21 1998

### Memorandum of Opinion

    The court has for consideration the defendants' motion for summary judgment, filed September 1, 1998. Both parties have been given an opportunity to brief the issues and the court heard oral argument on November 30, 1998. The motion is therefore properly before the court and ripe for decision. Upon due consideration of the parties' argument respecting the motion, however, the court has come to the conclusion that it cannot properly exercise jurisdiction over this matter. Therefore the case will be remanded to the Circuit Court for Madison County, Alabama, from whence it was removed.

    The plaintiffs have sued Chrysler Corporation ("Chrysler"), and Sarah Howard ("Howard"), a member of Chrysler's management at the Huntsville, Alabama, plant, alleging that Howard made and Chrysler breached the terms of an agreement by which the plaintiffs gave up their jobs and seniority rights at Chrysler in exchange for a lump sum payment and certain other benefits. Specifically, the plaintiffs allege that, in explaining the terms of Chrysler's Voluntary Termination of Employment Plan ("VTEP") severance package, Howard promised that if Chrysler's circumstances changed and the plant began



hiring again those accepting the VTEP agreement would be given hiring preference over

non-employees of Chrysler.  Plaintiffs further contend that they accepted the VTEP offer

on these terms, and that Chrysler breached the terms of the agreement thus formed by

refusing to rehire the plaintiffs when job openings later became available.

## I.    Statement of Facts.[1]

Viewed in the light most favorable to the plaintiff, the record before the court on

summary judgment suggests the following version of events. As part of its collective

bargaining agreement with the UAW, Chrysler negotiated a nationwide VTEP program.

Several committees, including the national and local Employment Security System ("ESS")

committees and the National Job Security, Operational Effectiveness and Sourcing

Committee, are responsible for administering the program, and all of these committees

have members from both Chrysler and the union. The committees determine which groups

or classifications of employees will be offered the VTEP, depending on the economic

situation in particular plants and the demand for particular types of employees. As best the

court can tell from the record before it, once a particular job classification at a particular

plant is offered the VTEP, any or all of the employees in that group can take the VTEP offer

as long as they have at least one year of seniority with Chrysler, are at work or listed in

Chrysler's job security bank, and are not eligible to retire under Chrysler's pension plan.

---

[1] The facts set out below are gleaned from the parties' submission of facts claimed to be undisputed, the parties' respective responses to those claims, and the court's own examination of the evidentiary record. These are the "facts" for summary judgment purposes only. They may not be the actual facts. *Cox v. Administrator U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994), *cert. denied, USX Corp. v. Cox*, 114 S. Ct. 900 (1995).

2

The VTEP does not appear to set limits on the number of employees in each group who can take the offer.

Those who are offered the VTEP and accept it are guaranteed a lump sum payment based upon the employee's years of seniority, and also receive six months of continued basic health care coverage. For all other purposes, employees taking the VTEP offer terminate their employment and lose their other benefits from Chrysler. The VTEP has a provision which explains the consequences of a VTEP employee being rehired by Chrysler at a later date, and provides that such an employee will not be eligible for another VTEP until he or she has accumulated five more years of seniority with the company. The VTEP otherwise does not mention the rehire possibility.

In 1990, certain workers at the Chrysler plant in Huntsville were offered the VTEP, including all but one of the plaintiffs. A number of the plaintiffs claim that during various meetings and conversations, Sarah Howard and other Chrysler representatives induced them to accept the VTEP by promising that if Chrysler began rehiring, VTEP employees would be given preferences for rehire over new employees off the street.[2] The plaintiffs, allegedly relying on this promise, took the VTEP offer.

In late 1994 and early 1995, business improved for Chrysler's Huntsville plant. The plant began rehiring off the street. Far from giving preference to the VTEP employees, Chrysler apparently instructed those doing the hiring that VTEP employees should

---

[2]Plaintiffs concede that their rehire rights would be subordinate to the seniority rights of Chrysler employees who retained their seniority.

3

generally not be rehired.  Several of the plaintiffs applied, and were rejected.  All of them apparently learned at about this time that they would not be rehired.

The UAW has already filed an unfair labor practice charge with the NLRB over the incident.  The union complained that Chrysler's oral promises regarding rehire were an attempt to deal directly with the employees, bypassing the union as their bargaining representative, and that altering the collectively bargained VTEP in this manner was an illegal practice.  The Regional Director of the NLRB declined to issue a complaint, however.

The plaintiffs filed suit on September 2, 1997 in the Circuit Court of Madison County against Chrysler and Howard.  The plaintiffs allege that the defendants entered into a contract to give them preferential rehire rights, and breached that contract  by not doing so.

## II.    Discussion.

The court has thoroughly reviewed the arguments advanced by both parties on summary judgment.  In the court's view, consideration of these arguments necessarily implicates the court's own jurisdiction.  A brief review of the summary judgment arguments quickly demonstrates why the substantive and jurisdictional issues in this case overlap.  The defendants argue that summary judgment is due on plaintiffs' sole claim, breach of contract, for four principle reasons: 1) Plaintiff's state law claim is preempted by § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a); 2) the claim is preempted by the National Labor Relations Act ("NLRA"), 29 U.S.C. § 151 *et seq.*; 3) the claim is preempted by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C.

4

§ 1001 et seq.; and 4) the claim is not viable under state contract law. Defendants also

contend that no claim against Sarah Howard for breach of contract is possible under

Alabama law. As a review of defendants' notice of removal reveals, they claim that this

court's jurisdiction to hear the case rests on precisely the same principles: 1) LMRA

preemption; 2) NLRA preemption; 3) ERISA preemption; and 4) the failure of any state law

claim against Sarah Howard, thus generating diversity. In resolving these questions for

summary judgment purposes, the court has been led to the conclusion that it has no

jurisdiction to decide the pending motion, and that it has no choice but to remand this case

for further proceedings in state court.

### A.    LMRA Preemption.

Defendants contend that this case should properly be governed by § 301 of the

LMRA, thus preempting plaintiffs' state claims and granting this court federal subject matter

jurisdiction. The LMRA grants federal district courts original jurisdiction over claims under

the Act as follows:

> Suits for violation of contracts between an employer and a labor organization
> representing employees in an industry affecting commerce as defined in this
> chapter, or between any such labor organizations, may be brought in any
> district court of the United States having jurisdiction of the parties, without
> respect to the amount in controversy or without regard to the citizenship of
> the parties. 29 U.S.C. § 185(a).

Under this provision, the federal district courts have jurisdiction to hear suits based upon

a collective bargaining agreement ("CBA") between employees and employers. *Knoll v.*

*Phoenix Steel Corp.*, 325 F. Supp. 666 (E.D. Pa. 1971), *aff'd*, 465 F.2d 1128 (3rd Cir. 1972),

*cert. denied*, 409 U.S. 1126 (1973). Even a suit, like this one, that does not specifically

plead violations of the LMRA may incur federal jurisdiction. The Supreme Court has read § 301 as far more than a mere jurisdictional provision - - according to the Court, it creates a uniform federal law of CBA interpretation which should govern any case in which interpretation of a collective agreement is critical to the resolution of the dispute. "[T]he subject matter of § 301(a) 'is peculiarly one that calls for uniform law.' . . . The possibility that individual contract terms may have different meanings under state and federal law would inevitably exert a disruptive influence upon both the negotiation and administration of collective agreements." *Local 174, Teamsters, Chauffeurs, Warehousemen & Helpers of America v. Lucas Flour Co.*, 369 U.S. 95, 103 (1962) (citations omitted) (quoting *Pennsylvania R.R. Co. v. Public Serv. Comm'n*, 250 U.S. 566, 569 (1919)); *see also Republic Steel Corp. v. Maddox*, 379 U.S. 650, 653 (1965). To protect this interest in uniformity, the Court has pushed aside state claims which may implicate the CBA in favor of federal law and federal jurisdiction. A long line of Supreme Court cases, beginning with *Textile Workers Union v. Lincoln Mills*, 353 U.S. 448 (1957), hold that, to the extent an otherwise valid state law is entangled with the rights and duties of the parties under a CBA, it is usually preempted.

However, this does not mean that every state claim, or even every contract claim, which is tangentially related to a collective agreement is preempted. Only claims in which the need for uniformity is implicated, i.e. claims which require actual interpretation of collectively bargained language, are subsumed by the LMRA. Thus "when resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract," *Allis-Chalmers Corp. v. Lueck*, 471 U.S.

6

202, 220 (1985), preemption applies. On the other hand, even if a claim under the CBA and a state law claim "would require addressing precisely the same set of facts, as long as the state-law claim can be resolved without interpreting the agreement itself, the claim is 'independent' of the agreement" and is not preempted. *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 409-10 (1988). Thus "a plaintiff covered by a collective-bargaining agreement is permitted to assert legal rights *independent* of that agreement, including state-law contract rights, so long as the contract relied upon is *not* a collective-bargaining agreement." *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 396 (1987)) (emphasis added). "'[I]t is the legal character of the claim, as 'independent' of rights under the collective bargaining agreement that decides whether a state cause of action may go forward.'" *Loewen Group International, Inc. v. Haberlichter*, 65 F.3d 1417, 1421-22 (7th Cir. 1995) (quoting *Livadas v. Bradshaw*, 512 U.S. 107 (1994)).

With these principles in mind, the court concludes that preemption is not appropriate in this case. While the contractual right plaintiffs sue on is admittedly closely tied to the VTEP, a collectively bargained agreement, the oral promise plaintiffs seek to enforce was not collectively bargained. Its language is individual and independent, and state, not federal, law will guide its interpretation. Nor does the VTEP itself provide any guidance on the question at hand. While it mentions the possibility of rehire, it certainly does not delineate any rehire rights for VTEP participants, or bar the possibility of such rights. Thus it is the independent oral promises, and not the collectively bargained VTEP, to which a court must turn to resolve the issues in this lawsuit. There is no interest in

uniform federal interpretation of these agreements, because they are individual and local, not uniform. Therefore the LMRA need not and should not govern the case.

Nor do defendants' other attempts to link the resolution of this case with the interpretation of collective agreements alter this court's conclusion. Defendants, citing *Schuver v. Midamerican Energy Co.*, 154 F.3d 795, 799 (8th Cir. 1998), argue that the very act of reviewing the collective agreements to see if they cover the issue in question itself requires their interpretation and triggers LMRA preemption. Defendants also claim that, because a review of the seniority provisions of the CBA might be required to assess whether the plaintiffs could have been rehired consistently with the seniority rights of other former Chrysler employees, liability depends on an interpretation of the CBA and preemption is appropriate. Finally, citing *Darden v. U.S. Steel Corp.*, 830 F.2d 1116 (11th Cir. 1987), defendants claim that the CBA and the LMRA must govern because the plaintiffs were Chrysler employees, governed by the CBA, at the time they accepted the VTEP offer.

The court respectfully suggests that these arguments ignore the entire purpose of LMRA preemption.[3] LMRA preemption, though powerful, is extremely limited in purpose and scope. It addresses only the "need for federal law to control interpretation of collective bargaining agreements." *White v. National Steel Corp.*, 938 F.2d 474, 484 (4th Cir. 1991); *see Lingle*, 486 U.S. at 409 n.8 (LMRA "pre-empts state law only insofar as

---

[3] While the defendants have not highlighted the issue, the LMRA might be implicated if plaintiffs were required to arbitrate their claims with Chrysler under the terms of the CBA. *See Lingle*, 486 U.S. at 411 (need to preserve arbitration is one of the main purposes of the LMRA). However, while the defendants have pointed out that a grievance procedure does exist under the terms of Chrysler's main agreement with the UAW, the defendants have not explained why this provision would apply to an individual side agreement, and the court has not located any clause expanding the scope of the grievance procedure beyond the CBA itself. Therefore the court must assume for these purposes that the CBA's arbitration provision does not govern the current dispute, which is based on individualized contractual terms.

resolution of the state-law claim requires the interpretation of a" CBA). For this reason the LMRA itself does not have anything to say about the possibility that other rights, and even other contracts, may exist between unionized employees and their employers. In fact, "Section 301 says nothing about the content or validity of individual employment contracts." *Caterpillar*, 482 U.S. at 394. Such contracts can be and are valid in some circumstances, and while they sometimes may be nullified by other provisions of the federal labor laws, *see id.* at 396-99; *Lingle*, 486 U.S. at 409 n.8; *White*, 938 F.2d at 484, the LMRA cannot be used to forbid them. *See Caterpillar*, 482 U.S. at 396-99.

Nor can the LMRA be used to do indirectly what it cannot do directly. If courts were to accept arguments that the LMRA preempts whenever a CBA has to be consulted to determine whether the LMRA preempts, *see Schuver*, or that the LMRA preempts because relatively straightforward interpretation of a CBA is required as background information to prove liability or damages, the LMRA would overrun every claim by a unionized employee against his employer. Thus the Supreme Court itself has admonished that "a state-law claim may depend for its resolution upon both the interpretation of a [CBA] and a separate state law analysis that does not turn on the agreement." *Lingle*, 486 U.S. 413 n.12. If it is the latter, not the former, which predominates, as for example when a CBA's terms are used to compute damages on a state law breach of contract claim, preemption does not apply. *Id.*

Likewise, as a number of courts have observed, "merely examining the [CBA] to determine whether a conflict actually exists is not 'interpreting' the [CBA] for § 301 preemption purposes. 'If it were, the section 301 pre-emption doctrine would swallow the

9

rule that employees covered by [CBA's] are entitled "to assert legal rights independent of that agreement, including state-law contract rights.""" *Loewen Group*, 65 F.3d at 1423 (quoting *Milne Employees Ass'n v. Sun Carriers, Inc.*, 960 F.2d 1401, 1409-10 (9th Cir. 1991)); *see Barske v. Rockwell Int'l Corp.*, 514 N.W.2d 917, 924 (Iowa 1994) (quoting same). Thus the minimal review of collective language required to resolve this case, whether that language is consulted to determine that the VTEP does not regulate rehire preferences, or to assess the hiring priority of Chrysler employees with seniority, or to determine benefits and damages, is simply not enough to implicate the LMRA.

Nor does the court agree with defendants that *Darden* compels a different conclusion. *Darden* did hold that the LMRA preempted the claims in that case, and explained this decision in part based on the court's conclusion that the promises sued on were made to unionized employees during the period of their employment. However, this alone is not enough to explain *Darden*'s decision. The Supreme Court has made it perfectly clear that the mere existence of a unionized employment relationship and a CBA is not enough to trigger LMRA preemption. "Section 301 does not . . . require that all 'employment-related matters involving unionized employees' be resolved through collective bargaining and thus be governed by federal common law created by § 301." *Caterpillar*, 482 U.S. at 396 n.10. Nor does *Darden* stand for such a broad proposition.

Instead, *Darden*'s conclusion appears to be based on the fact that the plaintiff's claim, both implicitly and explicitly, implicated the actual terms of the CBA. *Darden*, as Judge Hancock of this court has observed in deciding a companion case to this one, involved collective language which almost certainly spoke to the claims at issue. In

10

*Darden*, the plaintiffs claimed that their employer had guaranteed them jobs for at least ten years, and had breached this promise by laying them off. *See Darden*, 830 F.2d at 1118. However, as Judge Hancock pointed out, "It is difficult to imagine a labor contract that is not full of provisions regarding lay-off; thus, even though the *Darden* court did not explicitly so state, interpretation of those provisions certainly would have been necessary in order to resolve the dispute or claim in that case." *Allen v. Chrysler Corp., et al.,* CV 96-H-1074-NE (N.D. Ala. Jun. 7, 1996), at 10. In fact, *Darden* was even clearer about the reason for its result than Judge Hancock's language suggests. The court in *Darden* found it significant that "the plaintiffs actually allege a violation of the collective bargaining agreement in their complaints. Having done so, it is disingenuous for them now to maintain that their claims are not 'inextricably intertwined with consideration of the terms of the labor contract.'" *Darden*, 830 F.2d at 1116. For this reason, a number of courts have read *Darden*, and distinguished it, as a case in which the CBA "reasonably could be construed to govern the issue that had become the source of tension." *Wells v. General Motors Corp.,* 881 F.2d 166, 174 n.16 (5th Cir. 1989); *see, e.g., Trans Penn Wax Corp. v. McCandless,* 50 F.3d 217, 230 n.13 (3d Cir. 1995); *Allen,* at 10-11; *Barske,* 514 N.W.2d at 924.

The court agrees with this interpretation of *Darden*, and agrees as well that where a collective agreement does not "contain[] provisions that govern, or reasonably might be construed as governing, the circumstances at hand," in other words where the parties' individualized language, not collectively bargained language, must govern the case, state law must guide the court's inquiry and LMRA preemption is inappropriate. *Wells,* 881 F.2d 174. The court thus concurs in Judge Hancock's assessment of the same factual

11

circumstances: "Resolution of this dispute is not substantially dependent upon analysis of the terms of the Collective Bargaining Agreement between Chrysler and the union . . . . Similarly, no *interpretation* of any Collective Bargaining Agreement is required to resolve this dispute. Plaintiffs should be permitted to pursue their state law claims . . . because the rights on which those claims are based exist independently of the collective bargaining agreement and the VTEP provisions." *Allen*, at 10-11. The court holds that the plaintiffs' claims are not preempted by § 301 of the LMRA.

**B.    Preemption by Other Federal Labor Laws**.

Of course, as the Supreme Court has pointed out, the fact that the LMRA does not preempt the plaintiffs' state claims does not mean that they will ultimately survive in the face of other federal labor laws. *See Caterpillar*, 482 U.S. at 396-398. LMRA preemption, as already discussed, is limited in scope. However, "more general principles of preemption in the area of labor law speak to the supremacy of the bargaining agreements themselves in the face of inconsistent workplace understandings." *White*, 938 F.2d at 484. These alternative preemption principles include arguments that any individual contracts were "subsumed into, or eliminated by, the collective bargaining agreement," *Caterpillar*, 482 U.S. at 395-96 (discussing *J.I. Case & Co. v. NLRB*, 321 U.S. 332, 339 (1944)), that "the individual employment contract has been preempted due to the principle of exclusive representation," *Caterpillar*, 482 U.S. at 397; *see also White*, 938 F.2d at 484, that "enforcement of the individual employment contract arguably would constitute an unfair labor practice under the NLRA and is therefore preempted," *Caterpillar*, 482 U.S. at 397-98 (citing *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 244 (1959)), or that a

claim under such contracts would be preempted because their negotiation bypassed the union as exclusive bargaining representative and thus constituted an unfair labor practice. *Id.* at 398 n.12.

Defendants here have made most, if not all, of these arguments. If the decision were its to make, the court would be inclined to reject them all. Individual contracts are not forbidden *per se* by the federal labor laws, and they are at least in some circumstances enforceable via state law. Indeed, while courts have banned contracts which interfere with the collective bargaining process set up under the federal labor laws, directly conflict with a collective agreement, depart from such an agreement to the employee's detriment by "exact[ing] . . . any diminution of [an employer's] own obligation or any increase . . . [in] those of employees," *J.I. Case*, 321 U.S. at 339, or otherwise compromise the basic "principles of federal labor law," *White*, 938 F.2d at 486, even in these circumstances, courts have suggested that the employer may have to respond in damages for breach of its forbidden promises. *J.I. Case*, 321 U.S. at 340-42; *Belknap, Inc. v. Hale*, 463 U.S. 491, 506-07 (1983); *White*, 938 F.2d 485. After all, it is the employer, not the employee, who has done something wrong, and it does not serve the federal labor laws to allow the wrongdoer to escape responsibility for its action. *See Belknap*, 463 U.S. at 499-506. Thus as a general matter a court should be reluctant to bar a plaintiff's contractual claim, even if reliance on the same contract by an employer might be forbidden.

Nor, in this particular case, does the court see any reason to conclude that enforcement of Chrysler's promise would interfere with the workings of federal law. Neither the VTEP nor the other union agreements have any provisions governing VTEP

13

rights of union employees, so no direct conflict is posed by the rehire rights plaintiffs assert. While its true that these rights, if enforced, would affect hiring into positions governed by the general collective bargaining agreement, it appears that the CBA itself has no bearing on how employees "off the street," without prior seniority, are hired. Thus plaintiffs' rehire rights would have only minimal effect on the workings of the collective agreement. Because the already unionized employees will not be affected by the rehire rights, and because those who received these individualized benefits were leaving Chrysler and the union, there is little threat that the contracts would create dissension or discourage commitment to the union. The contracts only benefit the plaintiffs, and don't seem to hurt others, or in fact to affect others much at all. An independent contract should be valid and enforceable so long as "[t]he rights of no other employees covered by the CBA would in any way be affected by the alleged oral contract, the practice of entering into such individual agreements . . . does nothing to undermine the CBA, and the practice in no way undermines the CBA or frustrates federal labor policy." *Oney v. Kansas City Southern Rwy. Co.*, 3 F. Supp. 2d 729, 736 (E. D. Tex. 1997). That is precisely the situation here.

Nor does the court believe that consideration of plaintiffs' claims would interfere with the NLRB's primary jurisdiction over federal labor violations. In order to protect that jurisdiction, the Supreme Court has indicated that claims based on conduct "arguably protected or arguably prohibited" by sections 7 and 8 of the NLRA are banned from the courts and reserved for the decision of the NLRB. *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 244 (1959). However, this does not mean that any claim involving

the same factual background as a potential labor charge are necessarily preempted. *Garmon* preemption applies only where there is a threat of "interfer[ence] with the Board's determination of matters within its jurisdiction." *See Belknap*, 463 U.S. at 511. Thus the preemption inquiry must focus more specifically on what the NLRB and the court, respectively, would be called on to determine in order to resolve the issues before them. Thus the "critical inquiry in applying the *Garmon* rules . . . is whether the controversy presented to the state court is identical with that which could be presented to the Board." *Id.* at 510. *Garmon* preemption applies only where "the substance of the dispute is the same under both federal and state law." *Parker v. Connors Steel Co.*, 855 F.2d 1510, 1518 (11th Cir. 1988). That is simply not the case here.

The state contract claims pending before this court share no critical elements with the NLRA violations Chrysler suggests may have arguably occurred except for the bare factual question of whether Chrysler ever made an offer to the plaintiffs at all. A bad faith bargaining or direct dealing claim under the NLRA would revolve around the relationship between the employer and the union, requiring delicate factual and legal inquiries to determine whether Chrysler manipulated that relationship. To rule on a direct dealing claim, the NLRB would have to make determinations about whether Chrysler was under a duty to bargain, what the union knew and did not know about the possibility of rehire rights, whether the union wanted to bargain about these rights but was turned down, and other matters bearing on the question of whether individual contract negotiations were intended to and did harm the position of the union. In short, "In determining whether [Chrysler] impermissibly negotiated a contract to subvert the union agreement, the [NLRB]

15

would need to examine the facts surrounding the development of the individual contracts and determine whether [Chrysler] engaged in subversive behavior." *Loewen Group*, 65 F.3d at 1426-27. Likewise, critical to any bad faith bargaining claim would be inquiries about what the union knew about rehire rights, and whether the union was misled by statements made to the plaintiffs, because it is to the union, and not to individual employees, that Chrysler's duty to bargain in good faith runs. *See Milne Employees Ass'n v. Sun Carriers, Inc.,* 960 F.2d 1401, 1415-16 (9th Cir. 1991) (finding no *Garmon* preemption of state claims based on representations to individual employees, not the union); *Wells,* 881 F.2d at 172 (finding no *Garmon* preemption of claims similar to those here, noting that "it is relevant" that "the parties had completed collective bargaining" and only individual representations affecting individual decisions were left to be made).

Resolution of plaintiff's state law claims, in contrast, require a court to determine only whether promises were made, what those promises were, whether they were binding under state law, and whether they were breached. *See Loewen Group,* 65 F.3d at 427. The plaintiffs do not claim that the employees were collectively misled or that the union's position was compromised. *Compare Parker,* 855 F.2d at 1514, 1518 (finding preemption of claims that employer fraudulently misled employees into making collective concession agreements altering the CBA). They do not even claim that Chrysler lied in making promises to induce the employees to act. *Compare Wells,* 881 F.2d at 171-172. Instead, the plaintiffs' case revolves around the very different question of whether Chrysler can be forced to make those promises come true. The only question this inquiry shares with those which could be posed to the NLRB is the most basic one - - whether the promises were

ever made at all. This basic, purely factual question is not the sort which must be reserved to the NLRB in order to preserve its authority over nuanced questions of federal labor law. *See also Belknap*, 463 U.S. at 510 (allowing a claim that an employer allegedly made promises of permanent employment to replacement workers to go forward although the same promises might have formed the basis of an unfair labor practice charge). Thus allowing the plaintiffs to proceed with their contract claims seems to pose no threat to federal labor policy, and the court is inclined to the view that these claims would not be preempted, at least by the federal labor laws. The preemptive scope of these laws simply does not reach this far.

However, another limitation on the power of labor law preemption is even more important to the resolution of this case, and it is this. While, as described above, a number of flavors and variations of preemption stem from the policies of the federal labor laws, it is only the relatively narrow species of preemption generated by § 301 of the LMRA which has completely preemptive effect. In other words, while the other preemption principals may bar a state law claim, they do not transfigure it into a federal claim and so cannot provide a basis for federal question jurisdiction. If the requisites of jurisdiction are not met through some other avenue, the failure of defendants' claim of LMRA preemption means that this court has no jurisdiction to hear this case. As the Supreme Court has explained, "[t]he fact that a defendant might ultimately prove that a plaintiff's claims are pre-empted under the NLRA does not mean establish that they are removable to federal court." *Caterpillar*, 482 U.S. at 398. The same principle holds true for claims that the CBA somehow bars or preempts a claim based on an individual agreement. *Id.* at 397-98.

17

These claims also block, but do not transform, a state claim. Thus, because plaintiffs'
claims do not on their face require interpretation of a CBA's terms in order to resolve the
dispute, the jurisdiction of this court cannot be based on the federal labor laws. *See id.*
Because the court concludes, as described below, that no other proper basis of jurisdiction
exists either, it cannot and does not make any final determination on the remaining
questions of preemption under the federal labor laws.

   C.   **ERISA Preemption.**

   The defendants alternatively contend that plaintiffs' claims are preempted by ERISA.
ERISA preempts "any and all State laws" which "relate to" an employee benefit plan
covered by ERISA. *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 91, 103 S. Ct. 2890, 77 L. Ed.
2d 490 (1983); 29 U.S.C. §1144. A state law relates to an ERISA plan "in the normal sense
of the phrase, if it has a connection with or reference to such a plan." *Shaw v. Delta Air
Lines, Inc.*, 463 U.S. at 97. A state law need not expressly concern employee benefit plans
to be preempted. Even neutral state laws of general application are preempted insofar as
they apply to and affect ERISA plans. *Clark v. Coats & Clark, Inc.*, 865 F.2d 1237, 1243
(11th Cir. 1989). Thus the preemptive scope of ERISA includes, for example, state law
contract claims based on contracts linked to an ERISA plan. *See First National Life Ins.
Co. v. Sunshine-Jr. Food Stores, Inc.*, 960 F.2d 1546 (11th Cir. 1992). Perhaps most
importantly for these purposes, ERISA preemption, like that stemming from § 301 of the
LMRA, transforms a state cause of action into a federal one and generates federal question
jurisdiction.

It seems clear enough that, if the VTEP is an ERISA plan, any claim based on Chrysler's alleged oral agreement "relates to" that plan, and any claims based on such an agreement would thus be preempted. After all, accepting the VTEP was apparently the sole consideration offered by the plaintiffs in exchange for Chrysler's side of the oral contract. In other words, Chrysler's added promises were just an additional benefit thrown into the VTEP's terms. The two contracts thus seem quite closely related. One was consideration for the other.

The critical point of debate between the parties, then, is whether the VTEP was an ERISA plan at all. This is a far more difficult question. ERISA does cover severance benefits plans in at least some circumstances. *See, e.g., Whittemore v. Schlumberger Technology Corp.*, 976 F.2d 922, 923 (5th Cir. 1992); *McLemore v. United States Fidelity and Guaranty Co.*, 829 F. Supp. 192, 194-95 (S.D. Miss. 1993). However, to ensure that preemption only occurs when it serves the purposes underlying ERISA, the Supreme Court has explained that not all severance pay programs are properly designated as ERISA plans. The Court reasoned that ERISA is implicated, and preemption should apply, only when the provision of the benefits at issue "by nature requires an ongoing administrative program to meet the employer's obligations." *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 11 (1987). Thus only in such circumstances is a scheme to distribute benefits properly characterized as an ERISA plan.

In *Fort Halifax* itself, the Court upheld against an ERISA preemption challenge a Maine statute requiring an employer closing a plant to pay any terminated employee with three or more years seniority at that plant one week's severance pay for each year of

employment. *Id.* at 4-5 & n.1. The Court held that preempting the Maine statute "would not further the purpose of ERISA preemption." *Id.* at 8. In particular, the court had in mind two key purposes of the ERISA scheme. *See also Belanger v. Wyman-Gordon Co.*, 71 F.3d 451 454 (1st Cir. 1995) (discussing the "[t]wo . . . cardinal goals" which "influenced the Court's interpretation"). First, the Court focused on the purpose of ERISA preemption. The Court explained that "Congress intended pre-emption to afford employers the advantages of a uniform set of administrative procedures governed by a single set of regulations." *Fort Halifax*, 482 U.S. at 11. When an "employer makes a commitment systematically to pay certain benefits," such a uniform national program is the "most efficient way to meet these responsibilities." *Id.* at 9. "Such a system is difficult to achieve, however, if a benefit plan is subject to differing regulatory requirements in differing states." *Id.* Thus Congress crafted ERISA preemption to stave off the "prospect that an employer's administrative scheme would be subject to conflicting requirements." *Id.* at 10. "This concern only arises, however, with respect to benefits whose provision by nature requires an ongoing administrative program to meet the employer's obligation. It is for this reason that Congress pre-empted" only those state laws "relating to plans," for "[o]nly a plan embodies a set of administrative practices vulnerable to the burden that would be imposed by a patchwork scheme of regulations." *Id.* at 11-12.

The Court next focused on the core purpose of ERISA itself, the protection of employees by ensuring "the administrative integrity of benefit plans" against employer mismanagement and abuse. *Id.* at 15. ERISA's reporting requirements, fiduciary standards, and financial management regulations "safeguard employees from 'such abuses as self-

dealing, imprudent investing, and misappropriation of plan funds.'" *Id.* (quoting 120 Cong. Rec. 29197, 29932 (1974) (statement of Rep. Dent)). Again, however, "[o]nly 'plans' involve administrative activity potentially subject to employer abuse." *Id.* at 16. Where there is no ongoing operation to oversee, ERISA's requirement that a plan be operated in the interests of its beneficiaries is meaningless. Likewise, when no financial transactions are made, ERISA's reporting requirements are unnecessary. In such circumstances, "[i]t would make no sense for ERISA preemption to clear the way for exclusive federal regulation, for there would be nothing to regulate." *Id.*

Applying these principles to the case at hand, the Court reasoned that nothing in the Maine statute's provisions implicated the fundamentally administrative focus of ERISA. "The requirement of a one-time, lump-sum payment triggered by a single event requires no administrative scheme whatsoever to meet the employer's obligations." *Id.* at 12. Such an arrangement presents no risk of employer abuse, no chance that "an employer will evade or that a State will dislodge otherwise applicable federal regulatory requirements," nor does it create "any prospect that an employer will face difficulty in operating a unified administrative scheme for paying benefits." *Id.* at 17. Thus the Court held that the Maine statute did not implicate the complex administrative provisions which are the hallmark of an ERISA plan, and was not preempted. *Id.* at 18-19.

Admittedly, applying *Fort Halifax*'s principles sometimes requires some fairly neat line-drawing. *Fort Halifax* essentially requires a court to determine at what point the administrative structure of a benefits scheme becomes complex enough to implicate ERISA's purposes and so cross the threshold into "plan" status. The only guideposts the

21

Supreme Court has erected to direct this inquiry are the purposes of ERISA itself. As the

First Circuit has observed, "making particularized judgment on the basis of vague etchings

of policy is no mean feat, [but] 'so long as Fort Halifax prescribes a definition based on the

extent and complexity of administrative obligations, line drawing . . . is necessary and close

cases will approach the line from both sides.'" *Belanger*, 71 F.3d at 454 (quoting *Simas v.*

*Quaker Fabric Corp.*, 6 F.3d 849, 854 (1st Cir. 1993)). However, after close scrutiny of the

facts of this particular case, the court concludes that it should properly be placed on the

non-preempted side of the line.

Defendants point to several aspects of the VTEP which they believe make it

administratively complex enough to qualify as a plan. Defendants point out, for example,

the relevant national and local committees have to make many decisions including "where

and when a VTEP will be offered and the amounts of the payments that will be made,

based upon seniority. The committee must also determine each employee's eligibility to

participate" based on seniority and "at work" status. *Movants's Initial Submission In*

*Response to Exhibit D of the Court's Order*, at 14. Defendants also point out that VTEP

participants receive six months of health benefits, which the committees must "oversee,"

and the committees must ensure that information about the program is accurately relayed

to the eligible employees.

While each of these tasks requires some sort of administrative program in a general

sense, in the court's view they do not implicate the concerns underlying ERISA and *Fort*

*Halifax* and so do not require the sort of uniform administrative scheme which ERISA

contemplates. The fact that the distribution of benefits may require some basic record-

keeping and straight-forward determinations of eligibility for and the amount of payments is not sufficient to push a benefits program over the line into ERISA plan status. "'Simple or mechanical determinations do not necessarily require the establishment of such an administrative scheme.'" *Sherrod v. General Motors Corp.*, 33 F.3d 636, 638 (6th Cir. 1994) (quoting *Kulinski v. Medtronic Bio-Medicus, Inc.*, 21 F.3d 254 (8th Cir. 1994)). As a number of courts have observed, similar calculations were required under the statutory program at issue in *Fort Halifax. See, e.g., McLemore v. United States Fidelity and Guaranty Co.*, 829 F. Supp. 192, 196 (citing *James v. Fleet/Norstar Financial Group, Inc.*, 992 F.2d 463 (2d Cir. 1993)). Like the *Fort Halifax* scheme, the VTEP requires the employer to calculate eligibility based on current employment status and length of service, and then to calculate a lump-sum payment from a mechanical formula based on seniority. These types of basic determinations, as *Fort Halifax* explained, are not threatened by the possibility of different rules in different states and present no risk that an employer will abuse its discretion to the detriment of the beneficiaries. Thus they cannot sustain a finding of ERISA preemption.

Nor does the VTEP's provisions of six months of health coverage change this analysis. While the provision of these benefits almost certainly involves an on-going administrative scheme and an ERISA plan, it appears that the benefits would be provided pursuant to Chrysler's separate, previously established health care programs. [4] All the VTEP really does is require Chrysler to keep these employees on the books of its already extant plan for an extra six months. Any discretionary questions or interstate conflicts

---

[4] Chrysler has provided no proof to the contrary, so for these purposes the court will assume that this is the case.

which arise will almost certainly relate to and be governed by the health plan itself, not the VTEP, and will be regulated by ERISA as it applies to the health plan. Thus the VTEP has no independent need for ERISA's regulation and protection. As the Third Circuit has pointed out under similar circumstances, the VTEP's provision of health benefits requires no "new administrative scheme" and so does not qualify the VTEP for ERISA plan status. *Angst v. Mack Trucks, Inc.*, 969 F.2d 1530, 1538-39 (3d Cir. 1992). *Accord McLemore*, 829 F. Supp. at 197-198.

Defendants' argument that the administrative structure required to select which employees will be offered voluntary termination qualifies the VTEP as an ERISA plan is more interesting. It is true that these decisions are necessary and complex and require substantial discretion. However, in the court's view they are not the sort of decisions which implicate ERISA, because they do not really involve the distribution of benefits at all.

In fact, this argument points up the crucial difference between programs like those set up by the VTEP and *Fort Halifax*'s statute, and true ERISA plans. ERISA plans provide promises of long-term guaranteed benefits to employees. In such plans, the decision to offer benefits has already been made, and a commitment entered into. The decisions which remain to be made thus involve the financial management of the plan's assets, the distribution of benefits, and other matters relating to the provision of the promised benefits to employees. ERISA's rules are designed to assure that employers can and do keep their promises, so it is these decisions which are its chief concerns. *See Belanger*, 71 F.3d at 456 (discussing the importance of employee expectations in assessing ERISA's reach).

The VTEP is a very different animal. In essence, the VTEP is a preset formula for making cutbacks and offering severance benefits, which is only activated at each particular plant once the business decision is made that cutbacks at that plant are necessary and efficient. In other words, by entering into the VTEP, Chrysler has not promised that benefits will be offered, only that if they are they will conform to a particular formula. The decision to offer benefits in turn is to be made based on Chrysler's business position and needs based on broad skill classifications within each plant. Once a particular class of employees is selected for the VTEP offer, the process proceeds automatically without an individual assessment of which employees should be offered voluntary termination.

These decisions involve not the questions of how to administer a benefit scheme, but the threshold question of whether to offer benefits at all. Such primarily business-driven decisions are not the sort of decisions with which ERISA involves itself. "Every company uses some form of discretion in deciding whether or not to implement a certain type of benefit program. The process which the company goes through when making that determination, however, has nothing to do with how the 'plan' is administered once the company decides to put it in place." *Nelson v. General Motors Corp.*, 154 F.3d 1231 (6th Cir. 1998) (unpublished), *available in* 1998 WL 415993, at *4. Likewise, these decisions require neither the restrictions nor the protections of ERISA's provisions. Because both federal and state laws leave the core question of whether and when to offer early termination packages to the business judgment of the employer, the court sees little or no threat of inconsistent state regulation of such questions. For the same reason, there is no real threat of abuse - - the decision is to be made in the best interests of the employer in

the first place. Nor is there any employee expectation of future benefits offers to protect. If the corporate picture changes, it is clear enough that the VTEP offers may cease. Thus the decision to offer the VTEP involves matters outside the scope of ERISA's concerns, and the structure required to make it should not count as an administrative program for ERISA's purposes. The relevant administrative scheme at issue for *Fort Halifax's* purposes is "one which contemplates the methods by which the employer determines eligible employees and the extent of their individual awards; not the process by which the company arrives at the decision to offer benefits in the first place." *Nelson*, 1998 WL 415993, at *4.

A comparison of this situation with that posed by *Fort Halifax* underscores this point. In *Fort Halifax*, the condition predicate to severance benefits was a decision to close the employer's plant. This decision, though it obviously had to be made, was never even discussed by the Supreme Court because it had nothing to do with ERISA's purview over the administration of a benefits scheme. A decision by Chrysler that reductions in force are necessary at a particular plant, so severance benefits should be offered, is of the same character, and so should likewise be ignored.

Nor does the influence of the union on the decision-making process change the basic nature of the decision. It is still a business decision, based on the available work and the economic prospects of the company. The VTEP may therefore be offered, or not, at any particular time and place, based on the company's production needs at that location and the business judgment of the company and the union. *Plaintiff's Exh. 2* at 13-16 (Depo. or Russell Bayly, Chrysler's Manager of Union Relations Administration). "The purpose of the VTEP is always to see whether or not it makes economic sense to offer it." *Id.* at 14. If

Chrysler were forced by its agreement to offer the VTEP all the time, to any employee who wanted it, without regard to the company's own needs, that might be the sort of long-running benefits obligation which would qualify for ERISA coverage. But that is simply not the case. Whether the decision to offer the VTEP is controlled by the company alone, or by the company and the union together, those decisions are made with the financial needs of Chrysler in mind. The VTEP does not promise otherwise. Hence it does not bind Chrysler to the sort of long-standing, employee-focused benefits program which ERISA envisions. Instead, each individual decision to offer the VTEP in a particular time and place is really a new decision to offer benefits, and is not the sort of administrative decision with which ERISA concerns itself.

For the reasons outlined above, the court can see no significant ongoing administrative structure required to administer the VTEP once it is put in place as a benefits program. The purely mechanical calculations and straightforward explanation of benefits required to administer the VTEP are not the sort of activities which pose either the threat of undue state interference or employer abuse. The threshold decisions to offer the VTEP, while complex and discretionary, are not benefits administration decisions at all and lie outside the realm of ERISA's concerns. Thus, applying the *Fort Halifax* standard, the court concludes that the VTEP is not an ERISA plan.

This conclusion is buttressed by the Sixth Circuit's recent decision in *Nelson v. General Motors Corp.*,[5] 154 F.3d 1231 (6th Cir. 1998) (unpublished), *available in* 1998 WL

---

[5] While unpublished, this decision sheds substantial light on the application of the Sixth Circuit precedent cited by the parties to Chrysler's VTEP.

415993, at *4. Both parties have relied heavily on Sixth Circuit precedent in constructing their arguments. The defendants' argument in favor of preemption referenced almost exclusively *Shahid v. Ford Motor Co.*, 76 F.3d 1404, 1409 (6th Cir. 1996), *see Movants' Initial Submission In Response to Exhibit D of the Court's Order*, at 14, while the plaintiffs have cited *Sherrod v. General Motors Corp.*, 33 F.3d 636, 638 (6th Cir. 1994). In *Nelson*, however, the Sixth Circuit discussed both *Shahid* and *Sherrod* in determining that the VTEP contained in GM's main collective bargaining agreement was not an ERISA plan. The GM VTEP, remarkably similar to the one at issue here,[8] provided "a lump sum payment based on seniority" along with six months of continued medical coverage, *Nelson*, 1998 WL 415993, at *1, was offered at particular plants based on decisions made jointly by the local and national company and union management, *id.* at *3-*4, and was available only to employees on the job or in the job reserve bank who were ineligible to retire but had at least a year of seniority. *Id.* at *3. *Nelson* indicated that, in the Sixth Circuit's view, VTEP programs like those at issue here are "more like that of Sherrod than that of Shahid." *Id.* at *3. Based on substantially the reasoning outlined above, the court concluded that the GM VTEP "[i]n short . . . was not an employee benefit plan." *Id.* at *4. Finding the Sixth Circuit's reasoning in accord with its own, this court concludes that Chrysler's VTEP isn't either.

---

[8] The court suspects that the similarity is more than mere coincidence, and is probably best explained as a family resemblance stemming from the UAW's negotiation of both VTEP programs.

28

Because the VTEP is not an ERISA plan, no preemption applies. As discussed above, LMRA preemption does not apply either. This means that this court's jurisdiction, if it exists at all, must rest on diversity via 28 U.S.C. § 1332.

**D.    Viability of Plaintiff's State Law Claims**.

In order to meet the jurisdictional requisites of § 1332, of course, defendants must dispose of plaintiffs' claims against the non-diverse defendant, Sarah Howard. To be more specific, defendants must shoulder the heavy burden of showing that, at the time the action was removed, Howard was fraudulently joined. In order to sustain a claim of fraudulent joinder, the defendants must establish that there is no possibility that any of the plaintiffs can establish any cause of action against a non-diverse defendant. *See Crowe v. Coleman,* 113 F.3d 1536, 1538 (11th Cir. 1997); *Cabalceta v. Standard Fruit Co.,* 883 F.2d 1553, 1561 (11th Cir. 1989)). This burden is a "heavy one." *Crowe,* 113 F.3d at 1538. To determine whether jurisdiction is proper, the court must evaluate the factual allegations in the light most favorable to the plaintiff and must resolve any uncertainties about state substantive law in favor of the plaintiff. *See id.* Finally, "[i]f there is even a *possibility* that a state court would find that the complaint states a cause of action against *any one* of the resident defendants, the federal court *must* find that joinder was proper and remand the case to the state court." *Coker v. Amoco Oil Co.,* 709 F.2d 1433, 1440 (11th Cir. 1983)(citing *Parks v. New York Times Co.,* 308 F.2d 474, 477-78 (5th Cir. 1962)) (emphasis added).

Defendants' stance on this question is a simple one. Defendants argue that there is no way that a contract claim, the only type of claim brought in this action, could be asserted against Sarah Howard. This is true, to a point. If Howard in fact made promises

to the plaintiffs, she clearly did so, at least purportedly, on Chrysler's behalf. The plaintiffs certainly would have understood this to be the case. Thus Howard was an agent making a contract with a third party on behalf of a known principle. While a fraud claim might lie against the agent in such circumstances, a contract claim usually will not. Only the principal is bound to the contract.

However, as with almost every rule, there are exceptions. Specifically, Alabama courts recognize an exception when the agent purports to have authority to bind her principal and induces a third party to contract, but actually has no such authority. Thus the general rule in Alabama concerning the liability of an agent for the breach of a contract entered on behalf of a disclosed principal is that the agent binds either the principal or herself to the contract, but not both. *See Mobile Ins., Inc. v. Smith*, 441 So. 2d 894, 897 (Ala.1983); *Gillis v. White*, 106 So. 166, 167 (Ala. 1925). If the agent fails, for lack of authority, to bind the principal, then the usual rule does not apply and she is personally liable on the contract. *Gillis*, 106 So. at 167. Plaintiffs' counsel made it clear, at oral argument, that this is the theory upon which plaintiffs have asserted claims against Howard.

While the court has its doubts about the viability of such a claim, it cannot say for certain that there would be no circumstances under which such a claim would be possible. Chrysler, which denies that it ever made or intended to make promises about rehire, certainly must assert that it did not authorize Howard to make them. Thus she may not have had actual authority to make any promises on Chrysler's behalf.[7] While the court suspects

---

[7] To the extent that the plaintiffs' pleadings take inconsistent positions, asserting both that Chrysler authorized and entered into a contract with them and that Howard did so on her own without authority, such pleading in the alternative is perfectly acceptable. Fed. R. Civ. P. 8(e)(2).

that she had apparent authority, the court can imagine circumstances in which she would

not,[8] particularly in light of the Eleventh Circuit's stern admonitions on this subject.

> Over and over again, we stress that "the trial court must be certain of its
> jurisdiction before embarking upon a safari in search of a judgment on the
> merits." When considering a motion for remand, federal courts are not to
> weigh the merits of a plaintiff's claim beyond determining whether it is an
> arguable one under state law.
>
> . . .
>
> [T]he plaintiff need not show that he could survive in the district court a
> motion for summary judgment filed by that in-state defendant. For a
> remand, the plaintiff's burden is much lighter than that: after drawing all
> reasonable inferences from the record in the plaintiff's favor and then
> resolving all contested issues of fact in favor of the plaintiff, there need
> only be "a reasonable basis for predicting that the state law *might* impose
> liability on the facts involved."

*Crowe*, 113 F.3d at 1538, 1541-42 (citations omitted) (emphasis in original). If any of the

plaintiffs can arguably state a claim against Howard under state law, this court has no

jurisdiction. It appears to the court that at least some of them *might* be able to, so the court

has no choice but to remand the case.

The court therefore need not and does not reach the merits of plaintiffs' state law

contract claims against Chrysler. While the court has its doubts about the viability of

---

[8] For example, it is not clear whether Sarah Howard had anything to do with the VTEP plan, or attended
the meetings about the plan. There seems to be a dispute on this point. Suppose she "had no role in the
process," and the duly appointed manager in charge of the VTEP had indicated at the official meeting that "no
special consideration" would be given during rehire. Ray Holton, Chrysler's Compensation and Benefits
Supervisor testified to precisely this version of events. *See Plaintiff's Exh. 3* at 29-30, 36. If Howard then had
bumped into one of the plaintiffs on the plant floor and, in a separate conversation, promised that VTEP employees
*would* be preferentially rehired, Chrysler might well be able to dissociate itself from this promise and show that
Howard did not have apparent authority to override Holton's official position and bind the company. Exactly this
sort of ad hoc conversation forms the basis, for example, of Susan Bodkin's and Darlene Phillips' claims. *See
Movants' Exh. D* at 18-20; *Movants' Exh. G* at 21-22. Thus if the testimony of *both* Holton and one of these two
plaintiffs were true, as is certainly possible, there might be a good chance that Bodkin and/or Phillips would not
be able to state a claim against Chrysler but would be able to force Howard to respond in money damages for
the breach of her promise.

31

plaintiffs' claims, *see, e.g., Smith v. Reynolds Metals Co.*, 497 So. 2d 93 (Ala. 1986); *Bates v. Jim Walter Resources, Inc.*, 418 So. 2d 903 (Ala. 1982); *Borum v. Alabama Inter-Forest Corp.*, 1998 WL 473307 (Ala. Civ. App.), it leaves these interesting questions of state law to the forum best suited to resolve them - the courts of the state of Alabama.

**III.    Conclusion.**

The court has a continuing obligation to assess its own jurisdiction, and to remand "if at any time before final judgment it appears that the . . . court lacks subject matter jurisdiction." 28 U.S.C. § 1447(c). Having found jurisdiction lacking in this case, the court will remand it to the Circuit Court for Madison County, Alabama, from whence it was improvidently removed. A separate order, consistent with this opinion, will be entered.

Done, this _2st_ of December, 1998.

EDWIN NELSON
UNITED STATES DISTRICT JUDGE